IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

JOSEPH DANIELS,

      **Plaintiff,**

v.                                      **Case No.: 2:20-cv-00230**

ANDREW M. SAUL,
**Commissioner of the
Social Security Administration,**

      **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration *(*hereinafter "Commissioner") denying Plaintiff's application for supplemental security income ("SSI") under Titles XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. The matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings, as articulated in their briefs. (ECF Nos. 17, 18).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Plaintiff's Motion for Judgment on the Pleadings, (ECF No. 17); **GRANT** Defendant's request to affirm the Commissioner's decision, (ECF No. 18); and **DISMISS** this action

from the docket of the Court.

## I.    Procedural History

On December 2, 2016, Plaintiff Joseph Daniels ("Claimant"), completed an application for SSI, alleging a disability onset date of November 20, 2010 due to severe rheumatoid arthritis in his joints, low back injury, depression, and bipolar disorder. (Tr. at 208-13, 229). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 130-34, 140-42). Claimant amended his alleged onset date to November 23, 2016 and filed a request for an administrative hearing, which was held on November 8, 2018 before the Honorable Jon K. Johnston, Administrative Law Judge (the "ALJ"). (Tr. at 29-42, 223). By written decision dated January 16, 2019, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 10-27). The ALJ's decision became the final decision of the Commissioner on February 7, 2020 when the Appeals Council denied Claimant's request for review. (Tr. at 1-6).

Claimant timely filed the present civil action seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's Complaint and a Transcript of Proceedings. (ECF Nos. 11, 12). Claimant then filed a Brief in Support of Judgment on the Pleadings and the Commissioner filed a Brief in Support of Defendant's Decision. (ECF Nos. 17, 18). Consequently, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 51 years old on his amended alleged onset date and 53 years old on the date of the ALJ's decision. (Tr. at 22). He has a high school education, communicates in English, and does not have any past relevant work experience. (Tr. at 22, 40, 228, 230).

### III.    **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary, and benefits are denied. 20 C.F.R. § 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 416.920(f). If the impairments do prevent the

performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. § 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id*. § 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id*. § 416.920a(d). A rating of "none" or "mild" in the four functional areas of understanding, remembering, or applying information; (2) interacting with others; (3) maintaining concentration, persistence, or pace; and (4) adapting or managing oneself will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic

work activities. *Id.* § 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* § 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. § 416.920a(e)(4).

Here, at the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since the date of his SSI application and amended alleged onset date. (Tr. at 16, Finding No. 1). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "degenerative disc disease of the lumbar spine and degenerative arthritis of the knees, bilaterally." (Tr. at 16, Finding No. 2). The ALJ also considered Claimant's chronic obstructive pulmonary disease, gastroesophageal reflux disease, history of rheumatoid arthritis, hyperlipidemia, hypertension, anxiety, and depression, but the ALJ concluded that the impairments were non-severe. (Tr. at 16-18). Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 18, Finding

5

No. 3). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except he can perform unskilled, entry level work. He can occasionally perform all postural activities (climb, balance, stoop, kneel, crouch, and crawl). He should avoid exposure to extreme cold and concentrated exposure to hazards such as heights and machinery.

(Tr. at 18-22, Finding No. 4).

At the fourth step, the ALJ determined that Claimant had no past relevant work. (Tr. at 22, Finding No. 5). Therefore, under the fifth and final inquiry, the ALJ assessed Claimant's age and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 22-23, Finding Nos. 6-9). The ALJ noted that (1) Claimant was born in 1965 and was defined as an individual closely approaching advanced age on the amended alleged onset date and the date of the application; (2) he had a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination because Claimant had no prior relevant work. (Tr. at 22, Finding Nos. 6-8). Considering these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy, including unskilled light-level work as a price marker, garment folder, and router. (Tr. at 22-23, Finding No. 9). Consequently, the ALJ concluded that Claimant was not disabled as defined by the Social Security Act. (Tr. at 23, Finding No. 10).

## IV.    Claimant's Challenge to the Commissioner's Decision

Claimant argues that the ALJ's RFC finding and subjective symptom analysis are not supported by substantial evidence. He contends that the RFC assessment is flawed because the ALJ (1) failed to perform a function-by-function analysis and specify how long Claimant could sit, stand, and walk in an eight-hour workday and (2) did not include

Claimant's use of a cane to ambulate. (ECF No. 17 at 8-11). Claimant further argues that the ALJ erred in assessing his subjective symptoms because the applicable ruling does not require that a claimant's allegations be completely consistent with the record or supported by objective medical evidence, and Claimant asserts that the ALJ should have questioned him regarding alleged non-compliance with doctor appointments and medication. (*Id*. at 12-13).

In response to Claimant's challenges, the Commissioner argues that Claimant ignores Social Security Ruling ("SSR") 83-10, which specifies the sitting, standing, and walking requirements of light work. (ECF No. 18 at 10). The Commissioner further contends that the ALJ thoroughly discussed the evidence supporting the functional limitations, as well as assigned great weight to the medical opinions that specified the length of time that Claimant could sit, stand, and walk. (*Id*. at 10-11). Regarding Claimant's use of a cane, the Commissioner asserts that the ALJ acknowledged that a physician assistant prescribed Claimant a cane at one point in 2017, but the order did not explain the extent to which Claimant needed to use the cane, and the ALJ cited extensive treatment records and Claimant's consultative examination, none of which indicated that Claimant used a cane to ambulate. (*Id*. at 11-12). Further, the Commissioner notes that the ALJ assigned great weight to the medical opinions which unanimously concluded that Claimant did not require a cane. (*Id*. at 12-13). Finally, the Commissioner contends that the ALJ properly explained the finding that Claimant's subjective allegations were not entirely consistent with the record, including his conservative treatment history, consultative examination findings, and non-compliance with treatment. (*Id*. at 13-15). The Commissioner notes that there are no medical source opinions in the file indicating more restrictive RFC limitations than the ALJ assessed. (*Id*. at 14).

V.    **Relevant Evidence**

The undersigned reviewed all of the evidence before the Court. The following evidence is most relevant to the issues in dispute.

*A.  Treatment Records*

On September 7, 2016, Claimant presented to his primary care provider, Christopher Tipton, PA-C, for regular follow-up. (Tr. at 293). Claimant complained of back pain, which he characterized as tingling, but stated that the condition was improving. (Tr. at 295). Claimant ambulated normally; appeared healthy; was in no acute distress; and denied weakness, numbness, or tingling in his lower extremities. (*Id*.). Physician Assistant Tipton did not find any abnormalities in Claimant's musculoskeletal or neurologic examinations. (Tr. at 296). He diagnosed Claimant with "chronic pain" and prescribed ibuprofen and Neurontin. (*Id*.). Physician Assistant Tipton recorded the same findings in Claimant's clinical record on March 13, 2017. (Tr. at 371-72). He additionally diagnosed Claimant with rheumatoid arthritis and referred Claimant to a rheumatologist. (Tr. at 372). On August 29, 2017, Physician Assistant Tipton again noted the same findings as Claimant's previous visits, but omitted the diagnosis of rheumatoid arthritis. (Tr. at 365-66).

An x-ray of Claimant's lumbar spine taken on August 30, 2017 showed no acute findings. (Tr. at 379). Claimant had mild multilevel spondylosis and mild to moderate disc space narrowing at the lower three intervertebral levels, but his vertebral height and alignment were maintained in his lumbar spine. (*Id*.). Physician Assistant Tipton wrote Claimant a prescription for a back brace. (Tr. at 498). He also prescribed Claimant a cane, two days later, on September 1, 2017, noting on the durable medical equipment order Claimant's diagnosis of lumbago-sciatica due to displacement of lumbar interverbal disc.

(Tr. at 497).

Claimant participated in four physical therapy sessions on October 11, 12, 17, and 18, 2017 to treat his lumbar spondylosis and strain of the muscle, fascia, and tendon in his lower back. (Tr. at 518-31). On October 23, 2017, Claimant presented to Chong Hwan Kim, M.D., at a pain clinic regarding back pain. (Tr. at 345). Dr. Kim noted Claimant's slow, antalgic gait. (Tr. at 346). He diagnosed Claimant with low back pain and bilateral leg pain, ordered an MRI, and recommended that Claimant complete physical therapy, as well as take over-the-counter medication as needed. (*Id.*). Claimant attended two more physical therapy sessions on October 24 and 25, 2017, but was discharged from treatment for non-participation. (Tr. at 513-17). Claimant had achieved 50 to 70 percent of his short and long term physical therapy goals. (Tr. at 513).

Claimant's lumbar MRI on November 27, 2017 showed mild to moderate multilevel degenerative change and disc disease causing acquired central canal and neuroforaminal narrowing. (Tr. at 332-33). Dr. Kim reviewed the MRI report at Claimant's next appointment on December 18, 2017. (Tr. at 341). Claimant complained of low back pain that radiated down his legs, particularly his left leg. (Tr. at 340). He still presented with a slow, antalgic gait. (Tr. at 341). Dr. Kim diagnosed Claimant with low back and bilateral leg pain. (*Id.*). He recommended diagnostic facet injections and then caudal epidural steroid injections, if needed. (*Id.*). Dr. Kim performed a bilateral diagnostic lumbar medial branch nerve block procedure in Claimant's L3 through S1 vertebral levels on January 24 and 31, 2018. (Tr. at 334, 337).

Claimant followed up with Physician Assistant Tipton on February 13, 2018. He still complained of back pain, which he characterized as tingling, but stated that the condition was improving. (Tr. at 361). Claimant ambulated normally; appeared healthy;

was in no acute distress; and denied weakness, numbness, or tingling in his lower extremities. (*Id.*). Physician Assistant Tipton still did not find any abnormalities in Claimant's musculoskeletal or neurologic examinations. (Tr. at 362). He diagnosed Claimant with chronic pain for which he prescribed ibuprofen and arthritis for which he ordered testing to determine if Claimant had rheumatoid arthritis. (*Id.*).

Claimant told Dr. Kim during his pain management appointment on February 27, 2018 that the facet injections he received in January were only 30 percent effective for five days. (Tr. at 495). He stated that he did not have to use his cane as much during that period of time, but the injections wore off and his back pain returned to baseline. (*Id.*). Claimant also reported severe right knee pain. (*Id.*). Dr. Kim again noted Claimant's slow, antalgic gait. (*Id.*). He ordered caudal injections, which were administered on March 7 and 14, 2018. (Tr. at 490, 492, 495).

Claimant presented to Family Nurse Practitioner Julie Walls regarding right knee pain on March 26, 2018. (Tr. at 500). He appeared acutely ill with limited ambulation and was using a cane. (Tr. at 501). On examination, Claimant had limited range of motion, crepitus, and pain on palpation in his right knee. (Tr. at 502). His x-ray showed right knee joint effusion. (Tr. at 506). Nurse Walls diagnosed Claimant with right knee pain and joint effusion. (Tr. at 502). She prescribed a topical non-steroidal anti-inflammatory drug and referred Claimant to an orthopedist. (*Id.*).

On April 18 and 25, 2018, Dr. Kim performed another bilateral diagnostic lumbar medial branch nerve block procedure, this time in Claimant's L1 through L4 vertebral levels. (Tr. at 482, 484). During his follow-up appointment with Dr. Kim on June 4, 2018, Claimant reported 75 to 80 percent pain relief. (Tr. at 480). However, Dr. Kim again noted Claimant's slow, antalgic gait. (*Id.*).

### B. *Evaluations and Opinion Evidence*

Deidre Parsley, D.O., performed an Internal Medicine Examination ("IME") of Claimant on January 25, 2017. Claimant ambulated with a stooped gait and mild limp, but he did not require the use of a hand-held assistive device. (Tr. at 326). He appeared stable at station and was comfortable sitting if he leaned forward, but he was uncomfortable in the supine position due to low back pain. (*Id.*). Dr. Parsley noted that Claimant had multiple tender joints, but there were no signs of rheumatoid arthritis. (Tr. at 328). She further recorded that Claimant reported tenderness in his lumbar spine, but there was no evidence of radiculopathy. (*Id.*). Claimant had some mild difficulty with balance maneuvers, was unable to fully squat due to knee pain, and had decreased right knee flexion, which produced some low back pain. (*Id.*). His lumbar spine x-ray showed lower lumbar degenerative disc and facet disease at L4 through S1. (Tr. at 329). X-rays of Claimant's knees showed mild osteoarthritis. (Tr. at 330, 331). Dr. Parsley diagnosed Claimant with history of rheumatoid arthritis and lumbalgia. (Tr. at 328).

On February 14, 2017, state agency physician Isidro Amigo, M.D., assessed Claimant's RFC based upon his review of Claimant's records. Dr. Amigo opined that Claimant could perform work at the light exertional level, including standing and/or walking with normal breaks for a total of about six hours in an eight-hour workday and sitting with normal breaks for about six hours in a normal workday. (Tr. at 110). To support the exertional limitations, Dr. Amigo listed Claimant's lower back pain with lumbar degenerative disc disease, bilateral knee and generalized joint pain, osteoarthritis in his knees, and his antalgic gait and slightly decreased strength of 4/5. (*Id.*). Dr. Amigo further assessed that Claimant could perform occasional postural activities, except that he could never kneel, crouch/squat, or crawl, and Claimant could withstand no

concentrated exposure to extreme cold, vibration, or hazards. (Tr. at 110-11).

On April 24, 2017, Uma Reddy, M.D., assessed Claimant's RFC at the reconsideration level of review. Dr. Reddy agreed that Claimant could perform light-level work that included standing and/or walking with normal breaks for a total of about six hours in an eight-hour workday; sitting with normal breaks for about six hours in a normal workday; and no concentrated exposure to extreme cold, vibration, or hazards. (Tr. at 124-26). However, Dr. Reddy found that Claimant's postural abilities were less limited than Dr. Amigo assessed. She concluded that Claimant could perform all postural activities on an occasional basis. (Tr. at 125).

### C.  Claimant's Statements

Claimant testified during his administrative hearing on November 8, 2018 that he lived with his son and son's mother. (Tr. at 34). His daily activities included sitting on the couch, watching television, helping around the house from time to time, and fixing meals, such as a sandwich. (Tr. at 35). Claimant stated that his pain injections only helped for a week or so, and he did not really notice any relief from physical therapy. (Tr. at 37, 40). He alleged that his back pain radiated into his lower extremity, and he sometimes came close to falling. (Tr. at 37). Claimant testified that he could only stand for five minutes before the pain began throbbing badly and he had to sit down. (*Id*.). He stated that Physician Assistant Tipton prescribed his cane and he always had it with him to maintain balance. (Tr. at 38). Claimant further testified that Physician Assistant Tipton prescribed a back brace that he wore daily for three to four hours at one time. (Tr. at 39).

### VI.  <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial

evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v.

Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th

Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a

*de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v.

Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589

(4th Cir. 1996)). Rather, the Court's role is limited to ensuring that the ALJ followed

applicable regulations and rulings in reaching his or her decision, and that the decision is

supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists,

the Court must affirm the Commissioner's decision "even should the court disagree with

such decision." *Blalock*, 483 F.2d at 775.

## VII.    <u>Discussion</u>

As previously stated, Claimant challenges the ALJ's RFC and subjective symptom

analyses on several grounds. Each challenge is addressed below, in turn.

### A.    *RFC*

Claimant first argues that the ALJ failed to assess his ability to sit, stand, and walk

and did not account for his use of a cane. SSR 96-8p provides guidance on how to properly

assess a claimant's RFC, which is the claimant's "ability to do sustained work-related

physical and mental activities in a work setting on a regular and continuing basis." SSR

96-8p, 1996 WL 374184, at *1. RFC is a measurement of the ***most*** that a claimant can do

despite his or her limitations resulting from both severe and non-severe impairments,

and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3.

Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." *Id.* Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4. In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7.

While an ALJ is not required to explicitly discuss "irrelevant or uncontested" functions, "[r]emand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177

14

(2d Cir. 2013)) (markings omitted).

### 1. Ability to sit, stand, and walk

Claimant contends that the ALJ failed to perform a function-by-function analysis and specify in his RFC how long he could sit, stand, and walk in an eight-hour workday. (ECF No. 17 at 8). In this case, the ALJ assessed that Claimant could perform work at the light exertional level with the additional limitations that the work must be entry level, unskilled work involving no more than occasional postural activities and no exposure to extreme cold and no concentrated exposure to hazards. (Tr. at 18).

As the Commissioner referenced, SSR 83-10 specifies that a "full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday," and "[s]itting may occur intermittently during the remaining time." SSR 83-10, 1983 WL 31251, at *6. Thus, by finding that Claimant could perform light work without any additional standing, walking, or sitting limitations, the ALJ concluded that Claimant could stand and walk for approximately six hours in an eight-hour workday with intermittent sitting. *Harrison v. Colvin*, No. 1:10-CV-18, 2013 WL 1661096, at *2 (M.D.N.C. Apr. 17, 2013) ("Thus, by finding that Ms. Harrison was capable of performing light work, the ALJ implicitly found that she was capable of standing or walking for approximately six hours in an eight-hour work day.").

Furthermore, contrary to Claimant's argument, the ALJ very clearly assessed Claimant's ability to perform the physical functions of standing, walking, and sitting. The ALJ recounted Claimant's allegations of low back pain that radiated to his left hip and leg, as well as "issues with his knees locking up," causing him to nearly fall a few times. (Tr. at 19). The ALJ further cited that Claimant's treating source prescribed a cane and back brace and that Claimant reported only temporary relief from injections and no relief from

physical therapy. (*Id.*). The ALJ noted that Claimant's reported activities included sitting and watching television, preparing simple meals, riding to the grocery store with his significant other, and attending medical appointments. (*Id.*).

Regarding Claimant's back impairment, the ALJ cited the objective evidence that Claimant had multi-level degenerative changes with facet disease at the L4-5 and L5-S1 levels. (Tr. at 19-20). The ALJ discussed the results of Claimant's consultative examination in February 2017, including that Claimant presented with a stooped gait and mild limp, but he did not use an assistive device for ambulation. (Tr. at 20). Also, the ALJ noted that Claimant expressed tenderness to palpation in his lower lumbar spine, but his sensation and reflexes were intact, and the examiner found no evidence of radiculopathy. (*Id.*). Finally, the ALJ discussed that Claimant's primary care records from 2016 and July 2017 showed normal sensation, gait, ambulation, and movement of all extremities. (Tr. at 20).

Regarding Claimant's knees, the ALJ cited that Claimant's muscle strength was 4/5 in his lower extremities during his February 2017 consultative examination, his knees popped with range of motion testing, range of motion was decreased in Claimant's right knee, Claimant was slightly unsteady when standing on one leg independently, and bilateral knee x-rays showed mild osteoarthritis. (*Id.*). The ALJ considered Claimant's primary care records from March 2018 when Claimant presented with a cane and complained of right knee pain for the past two weeks, which was confirmed by x-ray to be joint effusion. (*Id.*).

Lastly, the ALJ gave significant weight to the opinions of the state agency physicians, who concluded that Claimant could perform light-level work that included standing and/or walking with normal breaks for a total of about six hours in an eight-

hour workday and sitting with normal breaks for about six hours in a normal workday. (Tr. at 22, 110, 124-25). The ALJ discussed that the experts' opinions were consistent with Claimant's x-rays, MRIs, and examination findings. (Tr. at 22).

Based on the above, the ALJ properly evaluated Claimant's ability to sit, stand, and walk and concluded that Claimant could perform those functions within the parameters of light work, which includes standing or walking for a total of approximately 6 hours of an 8-hour workday and sitting intermittently during the remaining time. This finding is supported by the state agency physicians' opinions to which the ALJ gave significant weight, as well as other substantial evidence. Namely, although Claimant ambulated with an abnormal gait at his consultative examination in January 2017, pain management appointments in October and December 2017 and February 2018, and right knee pain appointment in March 2018, he appeared healthy, was in no acute distress, and ambulated normally during primary care appointments during the same period in March, July, and August 2017 and February 2018. (Tr. at 341, 346, 361, 365, 368, 371, 495, 501). Furthermore, despite the objective evidence showing mild to moderate degenerative changes and disc disease causing foraminal narrowing in his lumbar spine, Claimant characterized his back pain as tingling to his primary care provider, continually stating that it was improving, and always denying weakness, numbness, or tingling in his lower extremities. (Tr. at 295, 332-33, 361, 365, 371). His primary care provider documented normal musculoskeletal and neurologic examinations, and the consultative examiner found no evidence of radiculopathy. (Tr. at 296, 328, 362, 365-66, 372). During his administrative hearing, Claimant did not express any limitations regarding his ability to sit, expressing that he sat most of the day. (Tr. at 38).

Therefore, more than a scintilla of evidence supports the ALJ's findings regarding Claimant's ability to sit, stand, and walk. Claimant does not identify any material conflicting evidence that the ALJ failed to consider. Indeed, there are no medical opinions in the record from a treating or other source noting that Claimant had greater sitting, standing, or walking limitations than those assessed by the ALJ. For those reasons, the undersigned **FINDS** that the ALJ's RFC assessment regarding Claimant's ability to sit, stand, and walk is supported by substantial evidence.

### 2. Use of a cane

Claimant next argues that the ALJ erred in not including Claimant's need for a cane in the RFC finding. (ECF No. 17 at 9-10). Although SSR 96-9P addresses the use of a hand-held assistive device by individuals capable of less than a full range of sedentary work, district courts within the United States Court of Appeals for the Fourth Circuit have consistently referred to SSR 96-9P for direction when a claimant alleges that the ALJ failed to properly consider his or her use of a hand-held assistive device in the RFC analysis. *Lovejoy v. Berryhill*, No. 2:17-CV-02921, 2018 WL 2729240, at *14 (S.D.W. Va. May 2, 2018), *report and recommendation adopted,* 2018 WL 2728032 (S.D.W. Va. June 5, 2018) (collecting cases); (ECF No. 17 at 10-11) (stating the same). SSR 96-9P provides that an ALJ must consider the impact of a "medically required" hand-held assistive device on a claimant's RFC. A hand-held assistive device is "medically required" when "medical documentation establish[es] the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed." *Smith v. Colvin*, No. 4:15-CV-00175-RN, 2017 WL 27942, at *5 (E.D.N.C. Jan. 3, 2017) (citing SSR 96–9p, 1996 WL 374185, at *7). Importantly, "[a] prescription or the lack of a prescription for an assistive device is not necessarily dispositive of medical necessity." *Fletcher v. Colvin*, No.

18

1:14-CV-380, 2015 WL 4506699, at *8 (M.D.N.C. July 23, 2015) (citing *Staples v. Astrue,* 329 F. App'x 189, 191–92 (10th Cir. 2009); *see also Crocker v. Colvin*, No. 1:15-CV-1215, 2016 WL 1626591, at *19 (E.D. Va. Apr. 21, 2016) ("Courts in the Fourth Circuit have held that even where a claimant is prescribed a cane, substantial evidence may support a conclusion that the cane is not medically necessary, and as such, an ALJ's decision not to consider the impact of a claimant's cane use on her residual functional capacity is not error.") (collecting cases); *Morgan v. Comm'r, Soc. Sec.*, CIV. No. JKB-13-2088, 2014 WL 1764922, at *1 (D. Md. Apr. 30, 2014).

As SSR 96-9P emphasizes, medical documentation establishing the need for a hand-held assistive device is important not only to establish medical necessity, but also to identify the circumstances for which the device is needed. The particular facts of the case are critical, because even when a hand-held device is medically necessary, its use may not significantly erode the occupational base at issue.  SSR 96–9p, 1996 WL 374185, at *7. If an ALJ finds that an assistive device, such as a cane or walker, is not "medically necessary," the ALJ is not required to include the use of the cane or walker in the claimant's RFC. *Fletcher*, 2015 WL 4506699, at *8.

In this case, contrary to Claimant's assertion, the ALJ very thoroughly explained his basis for concluding that Claimant did not require a cane to ambulate. The ALJ discussed that, although Physician Assistant Tipton prescribed a cane in September 2017 and Claimant was ambulating with a cane during a primary care visit in March 2018 when complaining of right knee pain, Claimant ambulated normally during other examinations. (Tr. at 20). This finding is supported by substantial evidence. Physician Assistant Tipton did not specify the circumstances for which he prescribed a cane, and Claimant's other medical records fail to document his use of cane. In fact, although Claimant presented

with a stooped gait and mild limp during his consultative examination in January 2017, he did not require an assistive device, and he ambulated normally thereafter in August 2017 and February 2018 (Tr. at 326, 361, 365). Furthermore, although Dr. Kim noted Claimant's slow, antalgic gait during pain management visits in October and December 2017 and February and June 2018, Dr. Kim did not record any observations that Claimant required or used a cane. (Tr. at 341, 346, 480, 495).

For all of those reasons, the undersigned **FINDS** that the ALJ's RFC analysis and assessment regarding Claimant's use of a cane is supported by substantial evidence.

### B. Subjective Symptom Analysis

Claimant asserts that the ALJ's subjective symptoms was flawed because the ALJ required Claimant's allegations to be fully consistent with the record and supported by objective evidence; incorrectly determined that the allegations were inconsistent with the evidence; and did not question Claimant regarding his non-compliance with treatment before relying on it to undermine his credibility. Under the applicable Social Security rulings and regulations, an ALJ is obliged to use a two-step process when evaluating the credibility of a claimant's subjective statements regarding the effects of his or her symptoms. 20 C.F.R. § 416.929 (effective March 27, 2017). First, the ALJ must consider whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id.* § 416.929(a). In other words, "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *2 (effective March 16, 2016). Instead, evidence of objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" must be present in the record and

must demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 416.929(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* § 416.929(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must consider "other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms," including a claimant's own statements. SSR 16-3p, 2016 WL 1119029, at *5-*6. In evaluating a claimant's statements regarding his or her symptoms, the ALJ must consider "all of the relevant evidence," including: the claimant's history; objective medical findings obtained from medically acceptable clinical and laboratory diagnostic techniques; statements from the claimant, treating sources, and non-treating sources; and any other evidence relevant to the claimant's symptoms, such as, evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and other factors relating to functional limitations and restrictions due to the claimant's symptoms. 20 C.F.R. § 416.929(c)(1)-(3); *see also Craig*, 76 F.3d at 595; SSR 16-3p, 2016 WL 1119029, at *4-*7.

SSR 16-3p provides further instruction on what type of evidence should be considered when the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence. SSR 16-3p, 2016 WL 1119029, at *6. The ruling

presents an extensive list of evidence that may prove probative and notes that valuable evidence to consider may include (1) a longitudinal record of any treatment and its success or failure, including any side effects of medication and (2) indications of other impairments, such as potential mental impairments, that could account for an individual's allegations. *Id.*

> In *Hines v. Barnhart*, the Fourth Circuit stated that:
>
> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 16-3p, 2016 WL 1119029, at *5.

Ultimately, "it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough for [an ALJ] simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the [ALJ] evaluated the individual's symptoms." *Id.* at *9. SSR 16-3p instructs that "[t]he focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person;" rather, the core of an ALJ's inquiry is "whether

the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Id.* at *10.

When considering whether an ALJ's evaluation of a claimant's reported symptoms is supported by substantial evidence, the Court does not replace its own assessment for that of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to the weight to be afforded to a claimant's report of symptoms, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

In this case, the ALJ clearly performed the two-step process. The ALJ discussed Claimant's allegations of low back pain radiating into his left hip and leg, issues with his knees "locking up," causing him to nearly fall, difficulty sleeping due to pain, use of a prescribed cane and back brace, temporary pain relief from injections, and lack of relief from physical therapy. (Tr. at 19). Ultimately, after considering the evidence, the ALJ concluded that Claimant's medically determinable impairments could reasonably be expected to cause his alleged symptoms. (*Id.*). However, the ALJ found that Claimant's statements concerning the intensity, persistence, and limiting effects of the symptoms were "not entirely consistent with the medical evidence and other evidence in the record" for several reasons. The ALJ noted Claimant's normal sensation, gait, ambulation, and

23

movement of all extremities in his primary care records, as well as his intact sensation and reflexes and the lack of evidence of radiculopathy during his consultative examination. (Tr. at 20). The ALJ further cited that Claimant did not use an assistive device at such appointments. (*Id.*). The ALJ discussed the objective testing showing multi-level degenerative changes with facet disease in Claimant's lower lumbar spine and osteoarthritis in Claimant's knees and joint effusion in Claimant's right knee. (Tr. at 19-20). The ALJ also noted that Claimant was discharged from physical therapy for non-participation after attending only six sessions, and laboratory tests showed an absence of Claimant's prescribed Neurontin and Lortab in his blood, and Claimant did not list the medications in connection with his disability application. (Tr. at 20-21). The ALJ found that such evidence suggested that Claimant's symptoms were probably not as limiting as Claimant alleged. (Tr. at 20). Finally, the ALJ concluded that the type of treatment that Claimant received was not indicative of the severe limitations and pain that Claimant alleged. (Tr. at 21). The ALJ noted that Claimant was prescribed routine modalities such as medication, physical therapy, injections, and a back brace, but he did not receive more aggressive treatment such as surgery, a spinal cord stimulator or TENS unit, or chiropractic treatment. (*Id.*).

Therefore, to whatever extent that Claimant alleges that the ALJ required his allegations be completely consistent with the record or objective evidence, the undersigned finds that the argument lacks merit. The objective evidence was only one factor considered by the ALJ, and the ALJ did not discount Claimant's subjective complaints based on lack of objective evidence, but instead properly considered numerous factors, including the type of treatment that Claimant received and Claimant's non-compliance with treatment. *Cf. Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 97

(4th Cir. 2020) ("Thus, while the ALJ may have considered other evidence, his opinion indicates that the lack of objective medical evidence was his chief, if not definitive, reason for discounting Arakas's complaints."). Claimant contends that the ALJ was required to question him concerning his alleged non-compliance before relying on it as a basis to discount his subjective symptoms. However, Claimant does not cite any binding authority to support this argument. Rather, Claimant relies on SSR 16-3p, which states that the SSA "will not find an individual's symptoms inconsistent with the evidence in the record on this basis without ***considering*** possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints," and in doing so, the SSA "***may*** need to contact the individual regarding the lack of treatment or, at an administrative proceeding, ask why he or she has not complied with or sought treatment in a manner consistent with his or her complaints." SSR 16-3p, 2017 WL 5180304, at *9 (emphasis added).

Claimant also cites from an unpublished district court opinion a statement that "[b]efore a claimant is denied disability benefits because of a failure to follow a prescribed course of treatment, the adjudicator must inquire into the circumstances surrounding the failure." *Dunston v. Berryhill*, No. 5:17-CV-00380-FL, 2018 WL 4576783, at *9 (E.D.N.C. June 5, 2018), *report and recommendation adopted,* 2018 WL 4204639 (E.D.N.C. Sept. 4, 2018) (citing *Burnside* v. *Apfel*, 223 F.3d 840 (8th Cir. 2000)). However, a decision from another district court is of no precedential value in this Court. Moreover, the Court specifically noted in *Dunston* that, although the ALJ referenced non-compliance, it was not the sole basis for the credibility finding. *Id.* at *10. Specifically, like the ALJ in the instant matter, the ALJ in *Dunston* pointed to normal examination findings and conservative treatment among other factors. *Id.* The *Dunston* court ultimately found that

the claimant's challenge to the credibility finding lacked merit. *Id*.

Although not cited by Claimant, a concurring opinion in a recent unpublished Fourth Circuit case found that, in addition to the basis for remand stated in the majority opinion, the ALJ erred in relying on the claimant's failure to follow prescribed treatment as part of the credibility finding. *Keller v. Berryhill*, 754 F. App'x 193, 200 (4th Cir. 2018). The concurring Circuit Judge acknowledged that the Fourth Circuit has never "addressed the scope of ALJs' affirmative duty to elicit testimony on all noncompliant behaviors before relying on them in the credibility analysis." *Id*. However, the Circuit Judge pointed out that other circuits have concluded that unexplained instances of noncompliance do not alone constitute substantial evidence supporting a credibility finding and ALJs have an affirmative duty to inquire about noncompliance where the ALJ decision is based *primarily* on the claimant's noncompliance. *Id*. The Judge further noted that there was evidence in the case at bar that Keller's noncompliance with physical therapy was potentially based on financial difficulties, yet the ALJ never explored the issue of whether Keller had a justifiable reason for non-compliance. *Id*. Therefore, the concurring Circuit Judge stated that, although the Fourth Circuit has not ruled on the question, he believed that the ALJ should additionally address on remand the claimant's reasons for non-compliance with treatment. *Id*. The foregoing concurring opinion is likewise of no precedential value. However, even if the Court applies it to this case, the ALJ did not rely primarily or solely on the unexplained non-compliance to support the subjective symptom analysis. Rather, it was properly one of several factors that the ALJ considered. *Dunn v. Colvin*, 607 F. App'x 264, 276 (4th Cir. 2015).

Consequently, although Claimant disagrees with the ALJ's analysis and conclusions, he does not identify any material conflicting evidence that the ALJ failed to

consider or any misstatement of the evidence of record. To the extent that the ALJ did not elaborate upon his consideration of the possible reasons for Claimant's non-compliance, any such error is harmless because there was no critical evidence on the topic in the record that demanded discussion, the law does not impose a specific requirement regarding the extent to which the ALJ must investigate or discuss the issue, and Claimant's non-compliance was only one of several reasons that the ALJ found that Claimant's allegations were not fully credible. Claimant simply asks the Court to reweigh the evidence and reach its own conclusions concerning Claimant's subjective symptoms. However, as previously explained, the Court cannot substitute its judgment for the ALJ. *Hays*, 907 F.2d at 1456. Rather, the Court can only scrutinize the evidence to determine if it is sufficient to support the ALJ's conclusions. In this case, that standard is satisfied. As shown above, the ALJ properly considered Claimant's statements, medical treatment, and other evidence to evaluate the intensity, persistence, and severity of Claimant's reported symptoms. Claimant offers nothing to rebut the ALJ's well-reasoned conclusions and specific citations to the record. Therefore, the undersigned **FINDS** that substantial evidence supports the ALJ's subjective symptom analysis.

## VIII.  Recommendations for Disposition

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's motion for judgment on the pleadings, (ECF No. 17); **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 18); and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is

hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Copenhaver, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** January 26, 2021

Cheryl A. Eifert
United States Magistrate Judge

28